# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LEON R. ROUSE,
             *Plaintiff-Appellant,*

v.

UNITED STATES DEPARTMENT OF
STATE; JOHN NEGROPONTE; THOMAS
HUBBARD; JOHN CAUFIELD; MARTHA
SARDINAS; PAUL BOYD; JOSEPH
BRACKEN,
             *Defendants-Appellees.*

No. 06-15967

D.C. No.
CV-05-00620-SPK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Samuel P. King, District Judge, Presiding

Argued and Submitted
September 12, 2008—San Francisco, California

Filed November 24, 2008

Before: Diarmuid F. O'Scannlain, Ronald M. Gould, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain

15715

## COUNSEL

Kari E. Hong, Law Offices of Kari E. Hong, Oakland, California, argued the cause for the plaintiff-appellant and filed the briefs.

Derrick K. Watson, Assistant United States Attorney, Honolulu, Hawaii, argued the cause for the defendants-appellees; Lawrence L. Tong, Assistant United States Attorney, Honolulu, Hawaii, filed the brief; Edward H. Kubo, Jr., United States Attorney, District of Hawaii; Jeremy M. Weinberg, Brian J. Egan, and Shawn M. Pompian, United States Department of State, Office of the Legal Adviser, Washington, D.C., were on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a United States citizen may state a claim against the U.S. Department of State under the Privacy Act for damages arising from his imprisonment in a foreign country.

I

A

1

Leon Rouse is a citizen of the United States. On October 4, 1995, he was arrested in the Philippines when police entered his hotel room and found him and another individual, Godfrey Domingo, undressed. Domingo signed an affidavit stating he was a minor and that he and Rouse had engaged in sexual relations. Though Domingo later disavowed the affidavit, Rouse was charged under Philippine law with violating the "Special Protection of Children Against Child Abuse, Exploitation and Discrimination Act." The trial court ignored Domingo's repudiation and convicted Rouse, relying on the original affidavit, testimony indicating Rouse had engaged in consensual sex with a twenty-year-old male who "look[ed] like a minor," and the fact that Domingo and Rouse were found undressed together. Rouse continued to challenge his conviction in Philippine courts, but was sentenced to over ten years imprisonment on January 12, 1998. After eight years, he was released for medical reasons and deported to the United States.

2

On January 30, 1996, during Rouse's trial, consular officials from the United States Embassy in Manila (the "Embas-

sy") filed letters with the trial court, expressing concerns with evidentiary issues. The letters were accompanied by a warning that failure to respond would result in referral to the Philippine Ministry of Justice. The record does not appear to contain evidence of either a response from the judge or a referral by the Embassy.

Embassy officials raised Rouse's case with local officials, and the Ambassador himself broached the subject with a Philippine legislator. The Ambassador, however, did not think the matter merited the attention of the Philippine president. Consular officers also visited Rouse at least nineteen times during his confinement, communicated with him by telephone, and assisted in providing him with access to medical care.

3

Over the course of his confinement, Rouse executed numerous Privacy Act waivers permitting the Department of State (the "Department") to disclose information about his case to third parties. On several occasions, the Department responded to inquiries from private organizations and members of Congress without mentioning its doubts as to the propriety of Rouse's arrest and incarceration or its efforts to obtain his release. The Department also initially refused to release information to certain individuals or groups. Rouse asserts that he had signed Privacy Act waivers covering these parties and that the failure to disclose the records constituted willful and intentional misrepresentations on the part of the Department. The Government maintains that at worst it was "confused about the status of Mr. Rouse's waivers."

4

In "late 1999," Rouse asked the Department for a copy of any files which had been kept on him. While it appears the Department did not immediately provide a copy, it complied with this request by September 2000. Documents Rouse

alleged to be missing from his file were later made available to him via a Freedom of Information Act ("FOIA") request.

5

Rouse filed a petition with the United Nations Human Rights Committee ("UNHRC") on June 10, 2002, under the Optional Protocol to the International Covenant on Civil and Political Rights. On July 25, 2005, the UNHRC issued its views that Rouse had been improperly imprisoned on a number of evidentiary and procedural grounds.

B

Just short of two years following his return to the United States, Rouse filed a pro se complaint in the United States District Court for the District of Hawaii, seeking over nine million dollars in damages. *See* 5 U.S.C. § 552a(g)(5) (allowing a Privacy Act action to be filed "in the district in which the complainant resides").[1] He alleged that the Department violated the Privacy Act, 5 U.S.C. § 552a, by willfully and intentionally failing to maintain and to disseminate records regarding his case with the appropriate level of accuracy, relevance, timeliness, and completeness. As Rouse maintained that his arrest, indictment, and trial were fraught with procedural and evidentiary defects, he asserted that the Department's actions deprived him of the benefits of diplomatic and third-party efforts to secure his freedom.[2]

---

[1]Rouse's only claims are under the Privacy Act. He "specifically disclaim[ed] any attempt to assert a claim under the Federal Tort Claims Act."

[2]Specifically, Rouse alleged that the Department deliberately maintained, used, and disseminated inaccurate records which in turn denied him: 1) "a fair determination to his entitlement to [the Department's] exhaustive protective services"; 2) "a fair determination to his right to have and control the release of information about his case/situation" via Privacy Act waivers; 3) "ready access to his embassy records"; 4) "a fair determination to his entitlement to receive regularly scheduled [consular] visits"; and 5) "his right to U.S. Embassy assistance in knowing what rights [he] had a just claim to as well as what assistance and aid the U.S. Embassy should provide him."

The district court granted the Department's motion to dismiss, determining that Rouse's claims "would fail on the merits because of a lack of causation," the Privacy Act did not afford Rouse a remedy, and Rouse's complaint was "probably" barred by the applicable statute of limitations.[3] This timely appeal followed.

## II

**[1]** The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. 5 U.S.C. § 552a note. It provides agencies with "detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements" of the Act. *Doe v. Chao*, 540 U.S. 614, 618 (2004).

Broadly speaking, there are two types of Privacy Act claims: "accuracy" claims and "access" claims. Accuracy claims arise under two different provisions of the Act. The first requires an agency to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." *See* 5 U.S.C. § 552a(e)(5). The second mandates that "prior to disseminating any record about an individual to any person other than an agency . . . [it must] make reasonable efforts to assure that such records are accurate, complete, timely, and relevant for agency purposes." *Id.* § 552a(e)(6). Congress has provided for

---

[3]Rouse initially named the Embassy and various individuals as defendants. Because the Privacy Act only permits suits against an "agency," *see* 5 U.S.C. § 552a(g)(1), and does not apply to individual defendants, *see Schowengerdt v. Gen. Dynamics Corp.*, 823 F.2d 1328, 1340 (9th Cir. 1987), the district court dismissed the claims against the individual defendants and substituted the Department of State for the Embassy.

civil remedies for violation of these provisions. *See id.* § 552a(g)(1)(C) (creating a cause of action when an agency "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual"); *id.* § 552a(g)(1)(D) (creating a cause of action where an agency "fails to comply with any other provision of this section . . . in such a way as to have an adverse effect on an individual"). If a court determines that an agency has violated these provisions in a manner that was "intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of actual damages sustained by the individual." *Id.* § 552a(g)(4).

Access claims, on the other hand, arise under a different provision, *id.* § 552a(d)(1) (requiring that agencies provide an individual "access to his record" "upon request"), and can likewise be enforced via civil action, *id.* § 552a(g)(1)(B) (creating a cause of action when an agency "refuses to comply with an individual request under subsection (d)(1)").

Rouse brings both accuracy and access claims. We review the district court's dismissal of these claims de novo, *see Weber v. Dep't of Veterans Affairs*, 521 F.3d 1061, 1065 (9th Cir. 2008), accepting "all material allegations of the complaint" as true and construing "all reasonable inferences" in favor of the nonmoving party, *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

### III

**[2]** We first consider whether Rouse's complaint was time-barred. The Privacy Act requires plaintiffs to bring suit within "two years from the date on which the cause of action arises." 5 U.S.C. § 552a(g)(5). Even if his complaint was filed outside

the two-year period, Rouse asserts that the statute should be equitably tolled to account for his imprisonment in a foreign country. We address each question in turn, reviewing de novo "the question of when a cause of action accrues [under the Privacy Act] and whether [such] a claim is barred by the statute of limitations." *See Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1127 (9th Cir. 2006).

## A

**[3]** Initially, we must determine whether Rouse's complaint was filed within two years of the date his cause of action allegedly arose. We have held that a cause of action arises under the Privacy Act when the plaintiff "knows or has reason to know of the alleged violation." *Rose v. United States*, 905 F.2d 1257, 1259 (9th Cir. 1990).

**[4]** Rouse "concedes that he was aware of many of the acts and omissions underlying the violations of the Privacy Act during the course of his imprisonment." The record bears this out. By 1998, Rouse allegedly "began to realize that the Embassy personnel were deliberately manipulating the existence and content of his [Privacy Act waivers]." At the very latest, Rouse would have been aware of the basis for his most recent allegation against the Department when he received his "complete" file pursuant to a FOIA request in early 2002. Accordingly, when Rouse's complaint was filed on September 27, 2005, it was filed more than two years after he knew or had reason to know of the alleged violations.

## B

**[5]** Before proceeding further, we must decide whether § 552a(g)(5) operates as a statute of limitations or as a jurisdictional bar. If it is the former, the traditional defenses of "waiver, estoppel, and equitable tolling" apply. *United States v. Locke*, 471 U.S. 84, 94 n.10 (1985). If it is the latter, such defenses are inapplicable, and we lack subject matter jurisdic-

tion over the case entirely. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

For many years, it was commonplace for courts to determine that time limits in statutes permitting suits against the government were jurisdictional in nature. *See, e.g.*, *Action on Smoking & Health v. C.A.B.*, 724 F.2d 211, 225 (D.C. Cir. 1984). Such statutes were viewed as conditions to waivers of sovereign immunity and were thus construed narrowly. *See Block v. North Dakota*, 461 U.S. 273, 287 (1983). Indeed, at least one of our sister circuits determined that § 552a(g)(5) was jurisdictional. *See Diliberti v. United States*, 817 F.2d 1259, 1262 (7th Cir. 1987). In *Irwin v. Department of Veterans Affairs*, 498 U.S. 89 (1990), however, the Supreme Court announced a "general rule" that "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." *Id.* at 95-96. The Court reasoned that while waivers of sovereign immunity had to be "unequivocally expressed," once Congress made such waiver, applying "the rule of equitable tolling . . . to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver." *Id.* at 95. Congress, the Court ruled, is presumed to legislate against the backdrop of private litigation, a backdrop which includes equitable tolling. *See id.*; *cf. United States v. Texas*, 507 U.S. 529, 534 (1993) (noting a "presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident" (internal quotation marks and citation omitted)).[4]

---

[4]Despite *Irwin*, *Diliberti* does not appear to have been directly overruled. We note that at least two other circuits (one in an unpublished disposition) have since ruled that § 552a(g)(5) is jurisdictional. *See Harrell v. Fleming*, 285 F.3d 1292, 1293 (10th Cir. 2002); *Weber v. Henderson*, 33 F. App'x 610, 611 (3d Cir. 2002). Both simply cite *Diliberti*, and neither appear to have considered the implications of *Irwin*.

The Supreme Court clarified its position in *United States v. Brockamp*, 519 U.S. 347 (1997). Before deciding whether *Irwin*'s general presumption in favor of equitable tolling had been rebutted, the Supreme Court assumed, "for argument's sake, that a tax refund suit and a private suit for restitution are *sufficiently similar* to warrant" application of the presumption. *Id.* at 350 (emphasis added). In other words, for *Irwin*'s presumption to apply, the underlying cause of action must be "sufficiently similar" to a traditional cause of action between private parties.

1

**[6]** The D.C. Circuit applied this methodology in *Chung v. U.S. Department of Justice*, 333 F.3d 273 (D.C. Cir. 2003), to hold that § 552a(g)(5) was not categorically jurisdictional. *See id.* at 277 (stating that for *Irwin* to apply, "the type of litigation at issue must not be so peculiarly governmental that there is no basis for assuming customary ground rules apply"). To ensure the presumption the Supreme Court established in *Irwin* received its proper weight, however, the court noted that this inquiry "must be conducted at a fairly high level of generality." *Id.* ("[T]he question we ask, therefore, is not whether the elements of, and remedies available in, the action against the Government mimic those of a private claim, but whether the injury to be redressed is of a type familiar to private litigation.").

**[7]** We agree with the D.C. Circuit's analysis in *Chung*. Here, Rouse claims that he was harmed by the Department's allegedly willful failure to disseminate and to maintain accurate records about the status of his case.[5] Taking the allegations in the complaint as true, we must assume that the Department was willfully misrepresenting information to and about Rouse. We are satisfied that these claims are suffi-

---

[5]These are listed in Rouse's complaint as his First, Second, Fourth, and Fifth Causes of Action.

ciently similar to traditional tort actions such as misrepresentation and false light to warrant the application of *Irwin*'s rebuttable presumption. *Cf.* Restatement (Second) of Torts § 525 (1977); *id.* § 532; *id.* § 652E. Rouse's claim pertaining to access to his Department file,[6] however, has no analog in private litigation. Accordingly, the "access" claim must be dismissed for lack of jurisdiction.[7]

2

**[8]** Having decided that the statute of limitations with respect to Rouse's "accuracy" claims is not jurisdictional, we must next ask the question: "Is there good reason to believe that Congress did *not* want the equitable tolling doctrine to apply?" *Brockamp*, 519 U.S. at 350. In other words, has the *Irwin* presumption been rebutted? The government contends that Congress "has already effectively allowed for equitable tolling" by including a "built in" exception to the statute of limitations. *United States v. Beggerly*, 524 U.S. 38, 48 (1998). That exception applies to situations

> where an agency has materially and willfully misrepresented any information required under this section to be disclosed to an individual and the information so misrepresented is material to establishment of the liability of the agency to the individual under this section the action may be brought at any time within two years after discovery by the individual of the misrepresentation.

---

[6]This is listed in Rouse's complaint as his Third Cause of Action.

[7]In any case, Rouse's access claims are moot, as he concedes he "received a copy of his embassy file." Other circuits have held that dismissal for mootness is appropriate in such circumstances, even where the records were not delivered in a timely fashion, *see, e.g.*, *Lovell v. Alderete*, 630 F.2d 428, 430-31 (5th Cir. 1980), and we have so held in the analogous FOIA context, *see, e.g.*, *Carter v. Veterans Admin.*, 780 F.2d 1479, 1480-81 (9th Cir. 1986).

5 U.S.C. § 552a(g)(5). While this language does cut against the presumption, as the D.C. Circuit noted in *Chung*, it does not defeat it. *See Chung*, 333 F.3d at 278-79. The Supreme Court has only found the *Irwin* presumption overcome when dealing with statutes containing "detail[ed], . . . technical language" and "explicit list[s] of exceptions," *Brockamp*, 519 U.S. at 352; circumstances where equitable tolling "could create serious administrative problems," *id.*; areas of law where the running of a defined statute of limitations is of "special importance," *Beggerly*, 524 U.S. at 49; or statutes the Court previously interpreted as jurisdictional in nature, *see John R. Sand & Gravel Co. v. United States*, 128 S. Ct. 750, 755 (2008).

**[9]** No such circumstances, nor any others that might militate against tolling, exist in this case. Accordingly, we conclude that the *Irwin* presumption has not been rebutted.

C

Is equitable tolling warranted on the facts of this case? In addition to arguing for tolling, Rouse maintains that the district court's suggestion that his claims were time-barred was particularly egregious because "[a] motion to dismiss based on the running of the statute of limitations period may be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995) (internal quotation marks and citation omitted).

**[10]** Despite Rouse's assertions, equitable tolling is applied "only sparingly." *Irwin*, 498 U.S. at 96; *Scholar v. Pac. Bell*, 963 F.2d 264, 268 (9th Cir. 1992). Significantly, "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, *and* (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)

(emphasis added); *see also Lawrence v. Florida*, 127 S. Ct. 1079, 1085 (2007) (noting that equitable tolling might be available "in light of the arguably extraordinary circumstances *and* the prisoner's diligence" (emphasis added)).

**[11]** In his brief, Rouse asserts that his imprisonment was an "extraordinary circumstance." However, that is only one prong of the *Pace* test; litigants seeking equitable tolling must also affirmatively demonstrate that they have diligently pursued their rights.[8] *See Pace*, 544 U.S. at 418 ("Even if we were to accept [that the petitioner satisfied the extraordinary circumstances test], he would not be entitled to [equitable tolling] because he has not established the requisite diligence."). The face of the complaint makes no reference to *any* attempt by Rouse to bring his claims in federal court during his imprisonment.[9] Indeed, Rouse makes no mention of the due diligence requirement, focusing exclusively on extraordinary circumstances.

**[12]** Rouse contends, nonetheless, that the availability of equitable tolling is not "generally amenable to resolution on a Rule 12(b)(6) motion" because resolution of the matter "often depends on matters outside the pleadings." *Supermail Cargo, Inc.*, 68 F.3d at 1206 (internal quotation marks and citation omitted); *see also Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993) (noting dismissal on the pleadings in a "handful" of "unusual cases"). However, we have dismissed claims on statute of limitations grounds when

---

[8]Examples of diligent pursuit include situations where defective complaints have been filed during the statutory period, *see, e.g.*, *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 430 (1965); *Corjasso v. Ayers*, 278 F.3d 874, 878 (9th Cir. 2002); or where the complainant has been "induced or tricked by his adversary's misconduct into allowing the filing deadline to pass," *see, e.g.*, *Irwin*, 498 U.S. at 96.

[9]If Rouse had filed his complaint during his imprisonment, his case could have been stayed until his release. *See Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 817 (9th Cir. 2003). Contrary to his assertions, Rouse would not have been required to "fully pursue a civil action" from prison.

"some fact, evident from the face of the complaint, supported the conclusion that the plaintiff could not prevail, as a matter of law, on the equitable tolling issue." *Cervantes*, 5 F.3d at 1276. Here, such conclusion is amply supported by several undisputed facts evident on the face of the complaint.[10] For example, Rouse's incarceration did not preclude him from transmitting a FOIA request to the Department of State in Washington, D.C., on August 3, 2000. During his confinement, he had two lawyers, requested and received legal materials from Department officials, had some level of access to a telephone and fax machine, and wrote numerous letters. Such facts, evident on the face of the complaint, lead us to conclude that as a matter of law, Rouse cannot establish that he is entitled to equitable tolling.

Moreover, Rouse's imprisonment did not prevent him from filing a complaint with the UNHRC in Geneva, Switzerland on June 10, 2002. If Rouse could lodge a complaint with that body, there is no reason he could not similarly file in federal court. *Cf. Washington v. Garrett*, 10 F.3d 1421, 1437 (9th Cir. 1993) (affirming the dismissal of an untimely filed discrimination suit when plaintiff had "proceeded correctly" in two related actions).

**[13]** While the district court did not squarely hold that Rouse's claims violated the statute of limitations, we may affirm the lower court's dismissal on any ground apparent from the record. *See Papa v. United States*, 281 F.3d 1004, 1009 (9th Cir. 2002). Because his complaint was filed outside the two year statute of limitations, and because he cannot demonstrate the diligence necessary to trigger equitable tolling, Rouse's claims are properly dismissed as time-barred.[11]

---

[10]The complaint includes all exhibits attached thereto. *See* Fed. R. Civ. P. 10(c); *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987).

[11]Rouse alleges that he should be allowed to take advantage of § 552a(g)(5)'s "built-in" tolling provision, discussed *supra* Part III.A.2,

IV

**[14]** Even if the complaint were not time barred, Rouse's claims would fail on the merits. As we lack jurisdiction over his access claim, we consider only Rouse's accuracy claims.[12] In order to state a claim under the accuracy provisions of the Privacy Act, an individual must show "1) that the government failed to fulfill its record keeping obligation, 2) which failure proximately caused the adverse determination, 3) that the agency failed intentionally or willfully to maintain the records, and 4) that the plaintiff suffered actual damages." *Rose*, 905 F.2d at 1259; *Hewitt v. Grabicki*, 794 F.2d 1373, 1379 (9th Cir. 1986) (noting that § 552a(g)(1)(C) "requires a causal connection between the allegedly erroneous agency record and an adverse determination made against the individual.");[13] *see also* 5 U.S.C. § 552a(g)(4) (noting that in actions under § 552a(g)(1)(C) or (D), damages are only available for injuries incurred "as a result of" alleged violations).

because he alleges material and willful misrepresentation. However, Rouse never raised this exception in his opening brief: indeed, he did not even quote the relevant part of the statute. Accordingly, he waived any potential benefit the exception might provide. *See Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003) (explaining that we "ordinarily will not consider matters on appeal that are not specifically and distinctly argued in an appellant's opening brief").

In any case, the exception would be irrelevant. Instead of the clock beginning to run from the time Rouse "knew or should have known," of the violation, the clock would start with his actual discovery of the violation. In this case, those points are one and the same. Whether the clock started when Rouse knew of the alleged violation or when he "discover-[ed]" the misrepresentation, it expired prior to the time Rouse filed his complaint.

[12]These are listed in Rouse's complaint as his First, Second, Fourth, and Fifth Causes of Action.

[13]*Rose* and *Hewitt* explicitly referenced § 552a(g)(1)(C). However, there is no reason § 552a(g)(1)(D) would require any less of a causal connection.

A

Because the district court relied on a causation analysis to dismiss Rouse's claims on the merits, we move first to the second *Rose* prong. The gravamen of Rouse's theory of causation is that the Department willfully and intentionally failed to keep, to maintain, and to disseminate accurate records about his case. He contends that if the Department had kept, maintained, and disseminated accurate records about his case, the Department (or a third party) would have been able to file diplomatic or other protests with the Philippine government. If these protests had been filed, Rouse would have been released from prison. The resulting prolonged imprisonment caused Rouse extreme emotional distress and other nonpecuniary harms.

[15] We agree with the Department's counsel that Rouse's chain of inferences "stretches any notion of proximate cause beyond the breaking point." Regardless of whether or not the records were accurately maintained and disseminated, it is pure speculation that the Department would review them and decide to pursue additional diplomatic protests. It is speculation upon speculation then to assume that if the Department or third parties decided to protest further, such protest would have ensured Rouse's early release. Indeed, such claims are belied by the record itself, which demonstrates that official Embassy protests in Rouse's case were unavailing. Thus, the district court did not err when it dismissed the case for "lack of causation."[14]

---

[14]Because we are satisfied that Rouse is unable to demonstrate the requisite causal link between the asserted violation and his alleged injuries, we need not decide whether the nonpecuniary emotional harms he alleges constitute "actual damages" under the Privacy Act. *See* 5 U.S.C. § 552a(g)(4)(A).

## B

Rouse's error is compounded by his belief he was entitled to further diplomatic efforts. Such claims are wholly outside the scope of the Privacy Act. Rouse bases this assumption on Department regulations and the Foreign Affairs Manual. *See, e.g.*, 22 C.F.R. § 71.6 (requiring Department officials to "extend every possible aid and assistance within their power to distressed American citizens"); 7 Foreign Aff. Manual § 426.1(b) ("If the legal and human rights of U.S. citizens and nationals arrested abroad are to be adequately protected, [the Department] must be prepared to protest substantiated violations of those rights [including] impressing on the host government that the U.S. Government . . . will not tolerate a violation of [its citizens] rights.").

In the first place, many of Rouse's claims of misrepresentation are based on records that include opinions and judgments as to the status of his case. Such records are not actionable under the Privacy Act. *See Hewitt*, 794 F.2d at 1379 (determining that characterizations of an employee's performance on a proficiency report were not appropriate grounds for a Privacy Act claim because "interpretation of facts is properly consigned to the professional judgment of the agency official").

**[16]** More significantly, we have found nothing in these regulations which indicates that they create a private right of action, much less one enforceable in court through the Privacy Act. Rouse must demonstrate that a federal *statute* vests him with such a right. *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not.").[15] This he does not do.

---

[15]Even if there were a cause of action available under these regulations, the Department acted properly. Where formal protest is warranted, the Foreign Affairs Manual notes that "the level at which the protest is made and the method are normally left to the post's discretion." 7 Foreign Aff. Manual § 426.3. In this case, the Embassy exercised its discretion and protested Rouse's treatment to the trial court and several Philippine officials.

Accordingly, the district court did not err in holding that the Privacy Act does not afford a remedy for the harms Rouse alleges.

V

Finally, Rouse contends that as he was litigating pro se in the district court, it was error to dismiss his claims without providing him the opportunity to amend his complaint. Rouse is correct that " '[d]ismissal of a *pro se* complaint without leave to amend is proper only if it is absolutely clear that the deficiencies of the complaint could not be cured by amendment.' " *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007) (quoting *Schucker v. Rockwood*, 846 F.2d 1202, 1203-04 (9th Cir. 1988)).

[17] For the reasons discussed above, any attempt to amend would be futile in this case. No amendment would be able to cure either the statute of limitations violation,[16] the lack of causation, or the fact that Department regulations do not provide Rouse with a cause of action. Accordingly, the district court did not err in declining to provide Rouse the opportunity to amend his complaint.

VI

Based on the foregoing, the decision of the district court is

**AFFIRMED**.

---

[16]For example, no amendment can explain how Rouse could have diligently preserved his rights in light of the fact that he filed an action with the UNHRC, but failed timely to file his Privacy Act complaint in federal court.